## MURPHY v. CITY OF ASBURY PARK et al.

### Civil Action No. 1926.

District Court, D. New Jersey.

Feb. 25, 1943.

Parsons, Labrecque & Borden, by Theodore D. Parsons, all of Red Bank, N. J., for plaintiff.

Joseph F. Mattice, of Asbury Park, N. J., for defendant City of Asbury Park.

FORMAN, District Judge.

The defendant, the City of Asbury Park, has moved for an order to set aside the verdict and the judgment entered against it and to have judgment entered in accordance with its motion for a directed verdict in its favor made at the trial of the case or, in the alternative, for a new trial.

Eleanor G. Murphy, plaintiff, sued the City of Asbury Park, Jersey Central Power & Light Company, John J. Bennett and Peter A. Bennett. At the conclusion of the plaintiff's case non-suits were granted

the Jersey Central Power & Light Company and John J. Bennett. A judgment of $25,000 was entered in favor of the plaintiff against the City of Asbury Park and Peter A. Bennett.

The plaintiff had sustained serious injuries when the automobile in which she was riding in the early evening of January 20, 1940, driven by the defendant, Peter A. Bennett, collided with a concrete base of a light standard constructed in the center of Ocean Avenue in Asbury Park.

Ocean Avenue is a main thorough-fare in that city, running parallel with and close to the beach. It carries much of the Asbury Park vehicular traffic and pedestrians going to and coming from the beach cross the thorough-fare. In 1921 the Commissioners of the City of Asbury Park passed an ordinance purporting to provide for the installation of concrete bases for lighting standards in Ocean Avenue. There was testimony in the case that according to the recollection of one of the witnesses, about fifteen years prior to the trial (1942) the city undertook the installation of these concrete bases in the center of Ocean Avenue for a number of blocks of its length. Each base consisted of a cylindrical concrete form with a flared circular bottom about four feet in diameter. Each stood in height approximately three and one-half feet from the surface of the street. On top of each base, which was the smaller end, was affixed a vertical metal column rising approximately ten feet which terminated in a decorative electric lamp or lantern. Originally glass button reflectors were provided in the bases. The evidence showed that some of these reflector devices had been removed and some had been covered by paint or whitewash applied to bases.

On the trial, the plaintiff produced two qualified highway engineers who testified that the bases along Ocean Avenue had been improperly installed in a manner not in accordance with generally accepted good engineering practice of that time. They testified that the standard of safety for this type of installation in the center of a traveled highway required that the bases be surrounded by an island with curbing to protect travelers from the hazard formed by their obstruction of the center of the highway.

The city offered no proof and rested its defense upon the legal grounds that it was not liable in damages for injuries sustained by the plaintiff due to a collision with one of its light bases. It contended that the legislature of New Jersey had authorized the obstruction of the highway and had conferred upon the municipality the right to exercise its own judgment and discretion in the type of installation forming the obstruction. Acting upon such legislative authority, the city claimed it legally installed the electric light bases in accordance with legislative sanction, that it had been guilty of no act of wrongdoing and that a duty was implicit upon the plaintiff to take notice of the legislatively sanctioned obstruction and avoid it.

The plaintiff denied that legislative authority was granted the city to install obstructions of the nature in question and urged that the city was guilty of active wrongdoing in the construction of the bases in the traveled portion of Ocean Avenue and that the existence of general statutes to which the city referred did not excuse it of such active wrongdoing in the light of the circumstances under which this plaintiff met her injuries.

There was introduced in evidence ordinance of the City of Asbury Park, No. 335, of September 27, 1921,[1] which provided for sundry improvements to be made and their estimated costs, among which the city claimed was authority for installing the concrete bases in question. This authority flowed from a statute, according to the city, which gave it the right to establish safety zones, erect, construct and maintain platforms commonly called "safety aisles"; standards commonly called "silent policemen", beacon lights, guide-posts, and other structures which it deemed necessary

[1] "No. 335. An ordinance providing for the replacing of certain fire plugs; * * *; bases for lamp standards in Ocean Avenue * * *. The Board of Commissioners of the City of Asbury Park, do ordain: 1. That the fire alarm system of Asbury Park be repaired and replaced by installing forty-seven (47) new fire plugs; * * * and that the necessary drains and sewers for standard lamps necessary in connection with the improvements to Ocean Avenue be installed and completed, * * *. 2. That the estimated cost for the replacing of fire plugs is $5,000 * * * For the extension and completion of the sewers and drains, bases for lamp standards in Ocean Avenue, * * * $52,000. * * * Adopted, September 27, 1921."

for the safety and convenience of persons and vehicles using its streets. This statute became effective March 29, 1927.[2]

On December 6, 1927, the city passed another ordinance which provided for a bond issue, the proceeds of which were designed to liquidate the temporary indebtedness incurred by the city for the cost of improvements set forth in Ordinance No. 335, among which the city claimed was the construction of the lamp bases in question in this suit. This ordinance was No. 454.[3]

The city relied heavily upon two cases— Lorentz v. Public Service R. Co., 103 N. J.L. 104, 134 A. 818, 49 A.L.R. 989; and Delaware, L. & W. R. Co. v. Chiara, 3 Cir., 95 F.2d 663.

In the former an accident occurred in 1930 when the plaintiff was a passenger in an automobile that collided with one of the columns of the elevated structure of the defendant on Central Avenue in Jersey City. The plaintiff charged that the columns interfered with the free public passage of Central Avenue; that the structure and the place where the accident occurred were unlighted and that the column was maintained in a dirty condition so that it could not be seen readily. The trial court found a verdict for the plaintiff. This was reversed, the Court of Errors and Appeals considering a number of New Jersey cases and reaffirming the theory that the legislature had the power to legalize what would otherwise be a nuisance in the way of an obstruction of a public highway. It held that such a structure as was before it had been authorized by the legislature in 1886. Pursuant thereto Jersey City had permitted its construction by a duly passed ordinance. The Court held that neither the statute nor the ordinance made any requirement as to lighting and in the absence thereof declined to say that it was

---

[2] "Safety zones and other structures for traffic regulations; exceptions. The governing body may establish safety zones, erect, construct and maintain platforms, commonly called 'safety aisles'; standards commonly called 'silent policemen', beacon lights, guide-posts and other structures which it may deem necessary for the safety and convenience of persons and vehicles using the streets of such municipality, but no such erections or constructions shall be made, operated or maintained on any state highway without permission of the state highway commission; nor shall any such erections or constructions be made, operated or maintained on any county road or county boulevard without permission of the board or body having control of or jurisdiction over such county road or boulevard." N.J.S.A. 40:-67-16.

[3] "An ordinance providing for the issuance of bonds of the City of Asbury Park in the amount of eighty four thousand dollars ($84,000.00) to pay the cost of improvements heretofore authorized and temporarily financed and is provided for in Ordinance No. 335 providing for the replacement of certain fire plugs; * * * bases for lamp standards in Ocean Avenue * * *. Whereas, under the provisions of Ordinance #335 adopted September 27, 1921, the Board of Commissioners of the City of Asbury Park authorized that the fire alarm system of Asbury Park be repaired and replaced by installing forty-seven (47) new fire plugs; * * * and that the necessary drains and sewers for standard lamps necessary in connection with the improvements to Ocean Avenue be installed and completed, * * *, and appropriated the money necessary for said improvements, and whereas, all the work provided for under said Ordinance has been completed, and, whereas, the total cost for all of said improvements amounted to the sum of One Hundred thousand five hundred Dollars ($100,500.), being the total of the amount authorized by said Ordinance, and whereas, the amount of said cost for said improvements has been temporarily financed by the issuance of Temporary Improvement bonds, and * * * whereas, the total cost and expense of all of said improvements as herein provided aggregated the sum of Eighty-Four Thousand Dollars ($84,000.) and it is necessary to raise the said amount of of Eighty Four Thousand Dollars ($84,000.) to pay for the same, and to retire such temporary improvement bonds. * * * 5. The Board of Commissioners of the City of Asbury Park do further ordain that the following matters are hereby determined and declared: (a) The average of the probable periods of usefullness of said improvements, taking into consideration the amount of the bonds to be issued on account of the several improvements, and the same having been considered and determined by the Board of Commissioners is fourteen years. (The original average periods of usefullness of said improvements being twenty years, six years of the period of said usefullness having already expired and leaving remaining fourteen years.) * * * Adopted,—December 6th, 1927."

the duty of the defendant to light and clean the columns. It concluded that although the structure was a physical obstruction in the highway it was authorized by law and used to facilitate travel. Hence it was held not to be a nuisance and the public was obliged to take notice of it.

In the case of Delaware, L. & W. R. Co. v. Chiara, the court reviewed the Lorentz case and many New Jersey decisions involving claims for injuries received in connection with obstructions in highways allegedly installed by legislative authority. Chiara, the plaintiff in the case, sustained an injury in 1935 when the automobile in which he was a passenger ran into a concrete foundation serving as the base of the central support of the railroad bridge which also crossed a public street in Jersey City. The sole question presented was whether or not the structure was a lawful one. The Commissioners of Jersey City passed an ordinance August 28, 1928, authorizing the railroad company, in accordance with blueprints submitted by it, to build a bridge supported by circular concrete columns located along the center line of the street and along each proposed curbline. The center piers contemplated as support for the bridge were to be sunk into the surface of the street. Actually they were not constructed as provided by the ordinance because there were water mains and sewers at that point and they were made to rest upon the concrete foundation with which the automobile collided. In 1934 the railroad, aware that the bridge was not constructed in accordance with the authorizing ordinance, petitioned the Board of Commissioners to ratify and confirm the construction of the foundations of the center line columns of the bridge and to grant permission to maintain it as constructed. Such a ratifying ordinance was passed by the Commissioners of Jersey City. It was contended that the Commissioners were without power to ratify the structure and even if the bridge was constructed pursuant to the authorizing ordinance there was none the less a nuisance because it was not sanctioned by legislative authority. The Court held that the ratification by the city of the construction as installed was appropriate and legal and dismissed the first contention.

As to the second contention, the Court referred to the basic New Jersey law that any unlawful obstruction of a highway is prima facie a nuisance and the party responsible for it is liable in damages to one injured thereby, Durant v. Palmer, 29 N. J.L. 544, as well as the principle that the legislature may legalize what otherwise might be a nuisance, Lorentz v. Public Service R. Co., supra.

Chiara contended that the foundation supporting the center piers in the middle of the street was not authorized by law and in fact was within the specific prohibition of Section 27 of "An Act concerning railroads", N.J.P.L.1903, c. 257, p. 659, as amended, R.S.N.J.1937, 48:12–50, N.J.S.A. 48:12–50.[4] It was urged that under this statute no railroad bridge whether purporting to be authorized by municipal authority or not could encroach upon the wagonway of a street. The railroad contended that its structure was authorized by Section 30, Chapter 145, page 377 of the Laws of New Jersey of 1925, R.S.N.J.1937, 48:12–79, N. J.S.A. 48:12–79.[5] It submitted that Section 27 aforesaid authorized a railroad company to pass over any street by way

[4] "27. Crossings in cities and towns above or below grade; permits; bridges over streets or highways.—Where any railroad shall cross any street or highway in any city or town it shall be either above or below the grade thereof, at such distance as shall not interfere with the free and uninterrupted use of such street or highway, unless the common council or other governing body of the city (or town, incorporated as such) in charge of the streets, shall grant permission to the railroad company to cross such street or highway at grade. Provided, that such permission shall not be necessary for the purpose of crossing at grade any street or highway which at the time of the acquirement of the right of way is not in use for pedestrians or wagons, either at the point of crossing or at some other point between the crossing the nearest terminus of such street or highway; where a railroad is constructed above the grade of any street or highway by a bridge, it shall be lawful for the company to erect piers for the support and safety of the bridge, which piers may be located at the outer edge of the wagonway, so as not to encroach thereon, and may extend thence into the sidewalk, or place left therefor; provided, that from the land on each side of said street or highway, so much shall be added to the sidewalk on that side and thrown open to public use for such purpose, as shall be occupied by the pier on that side."

[5] "30. In any municipality it shall be lawful for the proper municipal authorities to enter into such contracts with any

of a bridge without specific authority by way of ordinance from the municipal authorities so long as the bridge did not encroach upon the wagonway of the street, but that Section 30 provided a method whereby legal authorization may be procured from municipal authorities to cross a public street which may include encroachment upon the wagonway.

The Court concluded that the crossing of the street in question by the railroad was within the purposes set forth by the legislature in Section 30 aforesaid. It held that: "The grant to the appellant to cross Henderson street in the manner prescribed by the ratifying ordinance of March 6, 1934, by the municipal authorities seems to us a proper exercise of the police power vested by the Legislature in the city of Jersey City, and in our opinion there was nothing unconstitutional in the delegation of this police power by the Legislature to the municipality and nothing unreasonable in the manner of its exercise by the city of Jersey City. For analogy, see Swift v. Delaware, Lackawanna & Western R. Co., 66 N.J.Eq. 452, 58 A. 939. It follows therefore that the structure of the bridge, including the concrete foundation within the wagonway of Henderson street, was lawful and that members of the public, including the appellees, were required to take notice of its presence and situation and govern themselves accordingly." 95 F.2d at page 668.

█ In the case before us the first authorization by the municipality for the installation of the obstruction in Ocean Avenue was made in 1921. This occurred before the legislation cited by the City of Asbury Park as authority for its action was passed. The legislation in its present form came into existence in 1927. As a matter of fact, it first appeared in 1923, N.J.P.L.1923, c. 92, § 1, p. 178, N.J.S.A. 40:67–16, but even that was two years later than the city passed its ordinance. The second ordinance offered by the city was nothing more than a municipal authority for financing the liquidation of temporary obligations with the proceeds of which it must be assumed the city paid for the improvements authorized under the ordinance in which the concrete bases in question were included. An examination of the act of the legislature submitted as the authority for the city to encroach upon the center of the traveled portion of the highway leads one to the belief that this authorization was given to municipalities for the purpose of permitting the erection and installation of safety devices in the control of traffic. The items named in the statute are of this nature. They are safety aisles, standards commonly called "silent policemen", beacon lights, guide-posts, and other structures which the municipality may deem necessary for the safety and convenience of persons and vehicles using its streets. The city submits that the clause "other structures which it may deem necessary for the safety and convenience of persons and vehicles using the streets" is of such a broad nature as to include the concrete bases which supported lights installed in the center of the length of Ocean Avenue. I cannot agree that the statute contemplated this system of street lighting. The legislation was directed toward those

railroad company or companies whose roads may lie wholly or partially within the municipality or whose route has been located therein as will secure greater safety to persons or property therein, or will facilitate the construction therein . or maintenance of other than grade crossings of streets, highways or other railroads, or will provide for increased or improved station or terminal facilities and transportation service, or will improve the surroundings of or make more convenient the access to a station or stations of such railroad within such municipality, and for such purposes the municipal authorities may construct sidewalks on, pave, repave, curb, gutter, lay out, open, vacate, or alter the lines and change the grade of any streets, highways, squares or other public areas or places, and may lay out, improve and maintain public parks, plazas, or other public places, as a part of such improvements, and the railroad company may locate, relocate, change, alter grades of, depress or elevate any of its railroad tracks, bridges or facilities, and construct new or additional tracts and transportation or station facilities as shall be specified and provided for in such contract, and for the purposes of this act such municipality and such railroad company may take by purchase or condemnation any lands required for such improvements, and make such changes or conveyances of their respective lands or any interest therein as will facilitate said work and the cost and expenses of any such lands, changes and improvements shall be borne by such municipality and such railroad company in such shares or proportions as may be provided in said contract."

devices which had for their purpose the control and the facilitation of traffic in the street rather than the lighting of the street.

■■ In any event, the city passed its ordinance for the installation of the structures in question two years before even such authority was legislated. Although there was some testimony that the bases were actually installed about 1927 (fifteen years prior to the date of trial) the Ordinance 454 specifically mentions that the installations had at the time of its passage in December, 1927, existed for a period of six years of their estimated life of twenty years, and so they actually came into being before the legislation in question found its way to the statute books. When confronted with this situation the city ascribed its authority to construct the obstructing bases to the Municipal Home Rule Act of 1917, N.J.S.A. 40:56–1 [6] wherein power was given to municipalities to undertake the installation of "white ways" and local improvements generally. However, there is nothing in this statute beyond the authority given to municipalities to light such of their streets as they chose with brilliant illumination. The statute does not give rise to any inference that it authorizes municipalities to obstruct the traveled portions of highways in order that such lighting systems may be installed therein.

Therefore, I am constrained to the conclusion that this case differs from the decisions reached in the cases of Lorentz v. Public Service R. Co. and Delaware, L. & W. R. Co. v. Chiara, wherein there were grants by the legislature indicating authority vested in the municipality to obstruct the street or highway for a definite purpose followed by action upon the part of the municipality specifically providing by ordinance the manner in which the legislatively sanctioned obstruction could be installed.

The principles of law which govern the tort liability of a municipal corporation have had a large volume of interpretation as indicated by the numerous decisions rendered and commented upon by the New Jersey courts, but the application of principles to factual situations is often difficult. In Hammond v. Monmouth County, 117 N.J.L. 11, 186 A. 452, 453, the New Jersey Supreme Court, speaking through Justice Perskie, said: "In reason and logic, it is difficult to understand why there should be any distinction between passive and active wrongdoing, for, in either event, resultant consequences to the injured party are, of course, the same. Thus many legal authors contend with force and conviction that there appears to be no justifiable reason why a municipality should be any the less or more culpable for the negligent doing of an act than for the negligent failure to do the act. * * *"

The subject, however, was given modern treatment by the Court of Errors and Appeals of New Jersey, speaking through Justice Heher, in the case of Allas v. Borough of Rumson, 115 N.J.L. 593, 181 A. 175, 176, 102 A.L.R. 648. The defendant, a New Jersey municipality, in building its borough hall had connected it with the public road by an inclined passageway or ramp used by those having business to transact in the building. The ramp was wholly under the control of the borough and was without guard rails or barriers to protect from injury persons using it in a reasonable manner. The plaintiff in the case was nonsuited by the trial court. After an exhaustive consideration of the cases in New Jersey and elsewhere, the appellate court concluded that the municipality was the "active agent or instrument in the creation of a condition perilous to human safety on lands devoted by it to a public footway extending to its municipal building; it was directly responsible for the dangerous construction that, in the darkness of night particularly, constituted an everpresent men-

---

[6] "Any municipality may undertake any of the following works as a local improvement; and the governing body thereof may make, amend, repeal and enforce ordinances for carrying into effect all powers granted in this section: * * * j. The installation of service connections to a system of water, gas, light, heat or power works owned by a municipality or otherwise, including all such works as may be necessary for supplying water, gas, light, heat or power to real estate for whose benefit such services are provided; service connections including the laying, construction or placing of mains, conduits or cables in, under or along a street, alley or other public highway or portion thereof. The installation of such lighting standards, appliances and appurtenances as may be required for the brilliant illumination of the streets in those parts of the municipality where the governing body of the municipality may deem it necessary or proper to establish what is commonly called a 'white way.' * * *"

ace to the personal safety of the users of the premises." This it considered constituted a case of misfeasance or active wrongdoing attributable to the municipal corporation as distinguished from nonfeasance or mere negligence, stating: "There is an obvious distinction between keeping a highway free from nuisances and affirmatively creating one. In the one case it is mere neglect of a public duty for which there is no action for a private injury; in the other there is positive misfeasance. As was said in Hart v. [Board of Chosen] Freeholders of Union [County], supra [57 N.J.L. 90, 29 A. 490], 'there is no reason arising out of public policy why municipal corporations should be shielded from liability when a private injury is inflicted by their wrongful acts, as distinguished from mere negligence.'"

In our case there was testimony to show that the city had installed obstructions in the highway in a manner not in accord with professional standards of safety. The City of Asbury Park offered no testimony to refute this but relied upon the theory that it had legislative sanction to obstruct the highway in accordance with its judgment. I cannot agree that the city was vested with such authority and a jury has found that the condition that prevailed constituted a nuisance for which the city should respond to the plaintiff in damages. In such aspect the reasoning of the court in Allas v. Borough of Rumson, supra, appears to be particularly applicable and the motion of the defendant, the City of Asbury Park, to set aside the verdict and the judgment entered against it and to have judgment entered in accordance with its motion for a directed verdict in its favor made at the trial of the case or, in the alternative, for a new trial, will be denied.